I have you here as an appellant, Mr. Stanley, but you are not. Good thing I recognized you. Mr. Curland? Yes, Your Honor. All right, our schedule is a little reversed. Please, you're appellant. Yes, Your Honor. Right, you're for Belkin. Yes, Your Honor. All right, please proceed. Your Honor, we reserve three minutes for rebuttal. May it please the Court, I'm Lawrence Curland of Belkin. I'm sorry, Brian Cave here on behalf of the defendant, appellant Belkin. We're all confused. Yes, Your Honor. At the heart of this appeal, Your Honor, is this court's finding in ACCO v. Microsecurity Devices, 364 F. 3rd, 1075, the 2003 decision, in which the same patent was considered by this court and the limitation dealing with the sequence of operation of the lock was considered by this court and found to be an important limitation, the sequence being that the pin would enter the slot in the lock after the locking member, which was an upstanding chairman, would be rotated to the locked position. And that was definitively decided by this court as an essential limitation of all the claims that were issued in this patent when ACCO had sued someone else. Now, both the district court and ACCO agree that this sequence of operation, if it's not followed, that there's no infringement and there's no inducement to infringement. Is it Mr. Curland or Curland? Curland, Your Honor. Curland, okay, I want to make sure I get you in. You really don't, isn't it enough for us to decide this case just to understand that there are two ways of operating the system, method A and method B? Method A infringes, method B does not, correct? That's in a nutshell, isn't it? Yeah, that's part of it, Your Honor. That is correct, that based on the record below, there was a method called, at least referred to in the trials, the Dornfeld method. Based on the expert witness that plaintiffs put up. And then there was what's called the push-to-lock method, the one that Belkin advertised, promoted, and was the feature which the record shows was the reason that Belkin actually purchased the lock from ABA. Belkin did not design the lock or create the lock. Belkin went out and purchased an existing lock that was on the market. Now, the only issues of infringement in this case is inducement. It's not a case about direct infringement or whether Belkin sells the lock. Well, why isn't it about direct infringement? Because in order for Belkin to be guilty of induced infringement, someone has to be a direct infringer, correct? Yes, that is correct, Your Honor. So direct infringement is an issue. Oh, yes, I misspoke. I meant direct infringement by Belkin. Yeah, I see. Yes, that there are definitely… Well, wait a minute. If there's direct infringement by a user, then the question is Belkin's inducement. We're not dealing with Belkin as a direct infringer, are we? No, Your Honor. That is not an issue in this case. As an inducer. But there must be someone who's a direct infringer. Yes. Is that conceded that there was, or is that argued? No, Your Honor. There is no concession by Belkin that there is a direct infringer. In fact, the record is very clear that the only person who ever used the lock as a matter of proof in what was considered an infringing way was Dr. Dornfeld. That, in fact, Dr. Dornfeld in his own testimony, he was asked specifically did he have an opinion whether or not anybody else would use the lock that way, and he said he had no opinion on that. But why wasn't the jury free? I mean, I assume they had this lock, the accused device, as evidence. Why wasn't – right before that? Yes. Why weren't they free to take what Dr. Dornfeld said and then look at the lock themselves and reach the conclusion that it was most likely that users directly infringed? Why wasn't there that enough? Why isn't that enough? Because inducement, Your Honor, I believe, requires specific intent on the part of Belkin. Well, I'm back to direct infringement. I'm sorry. You're back to direct infringement. I'm starting with direct infringement. All right. I apologize. So is Your Honor's question why wouldn't it be enough for the jury to look and say could somebody use it and create direct infringement? Is that what the question is? Yeah. Well, there was testimony from Dr. Dornfeld that people – that it's much easier, that this is the way he would likely use it, and so forth. Well, he didn't – Your Honor, he didn't exactly say that. Well. What Dr. Dornfeld said is sometimes he finds it easier. His direct quote is sometimes he finds his method easier. Other instances he finds the – what we're calling the push-to-lock method easier. And although the brief seemed to suggest – the brief of Apple seemed to suggest that Dr. Dornfeld made a statement that he – as if it was an unequivocal statement that he finds it easier, that is incorrect and not supported by the record. Couldn't the jury have inferred that there was direct infringement from the testimony of Dornfeld? I don't believe that there was enough evidence for them to make that inference. Dr. Dornfeld's testimony, Your Honor, was equivocal at best. He was an expert. First of all, Dr. Dornfeld was a person who had testified for Apple in the first case I mentioned, Apple versus micro security, and in fact this very issue about when the pin entered the slot that came up was in that case. Dr. Dornfeld is a Ph.D. in mechanical engineering. I don't think it would be a proper inference to the jury to say that if an expert who is a Ph.D. in mechanical engineering who did not have directions in front of him, you said, who did not have the packaging in front of him, who just took the lock, had a certain bias in a sense, namely he was an expert for the other side, that he used it. But that question of bias was for the jury to weigh. That's correct, Your Honor. But, I mean, the logical question for Apple to have asked Dr. Dornfeld, which they never did, was, Dr. Dornfeld, do you have an opinion how anybody else would use this lock? We asked him that question, and he said, no, he didn't. It would seem to me that it would not be an appropriate inference if the expert himself who used it was testifying to the jury that he had no idea how anyone else would use the lock. Your Honor, basically your position is that as a matter of law, in this case, there's insufficient evidence of direct infringement because as you recited the testimony of Dr. Dornfeld, he just said, here's how I decided was the best way to do it when I picked it up without reading the instructions. I don't know how anyone else would do it, and there's no evidence either by surveys or anything as to how retailers or end users used it. That's correct. So you're saying really as a matter of law, there's insufficient evidence here. On direct infringement. On direct infringement. And I believe there's no evidence on inducement. Even if for purposes of this argument, we were to concede that, okay, somebody could appropriately infer that there will be a direct infringement. This is a case about inducement. So if they met that threshold, which I don't believe they can, that there's direct infringement, there was no evidence in the record that would satisfy that Belkin had the specific intent to induce infringement. Every piece of evidence, every piece of evidence pointed to the fact that Belkin had no knowledge of what we'll call the Dornfeld method. And that everything that they did was consistent with the way they advertised and promoted the lock. For example, Your Honor, the lock was a patented lock. It's in the record. ABA had a patent on their lock. The patented feature of that lock was this, what we're calling this push-to-lock method, which involved using, for shorthand, I'll call it a cammy action. Involved using tapered pins and sort of like a wedge so that as you pushed forward, there was what I call a translation of motion. You pushed forward and this piece rotated to the lock position. That was the feature that, according to the testimony from Belkin and so forth, convinced Belkin to buy this lock. That's the feature that was different from locks that were on the market. In order to try the Dornfeld method, you actually have to bypass and not use that cammy action at all. What you have to do is convert what was a one-step operation, namely advancing forward and two actions occur, into a two-step operation. First, rotating it so you can see it's clear, and then pushing pins in. You have to avoid something that is clearly in the design and that is a benefit of the design. If Your Honors want to see what I mean about the push-to-lock, the patent in the record figures, I believe, 2B and 3B of the patent illustrate what we're talking about. As you can see in figure 2B, when the device, what we'll call the locking members, has not yet been rotated, there isn't any room for the pins to pass. Mr. Kerlin, there's another defendant here, ABA, right? They didn't file an appeal. They didn't file an appeal. They were found liable. Yes, Your Honor. If we agree with your position and find, for one reason or another, that you're not an infringer, what does that do to the status of ABA having been found to have been an infringer? That doesn't do anything because one of the judge, the district court judge, pointed out, for example, and I'm not arguing ABA's case, Your Honor, that there was a clear distinction between ABA and Belkin. And the clear distinction had the bridge that the judge relied on. One of the problems with some of the points was a hand card that ABA had. The evidence was clear and the judge stated that Belkin had no knowledge of it, never knew of it, never distributed it. Now, we submit the hand card. In other words, the judgment against ABA would stand. Could stand, yes, Your Honor. Could stand. It could stand. Depending on what Your Honor's ruling was, if Your Honor thought, for example, and I'm not submitting that is the case, that the hand card was some indication that ABA had certain knowledge that Belkin didn't, you could draw a distinction between ABA's intent, so to speak, and Belkin's lack of intent. Well, Mr. Grant, leaving intent aside to pick up on what Judge Leary was saying, what if the court were to conclude that there was no direct infringement? What then would happen to the judgment against ABA? I would assume that ABA would have to come in and try to move to vacated, although they didn't appeal, so I think they put themselves in an interesting position, having basically taken no action and conceded that they didn't file an appeal to preserve their right. So I'm not sure whether ABA could move to vacated judgment that they didn't appeal from. But I haven't, in all honesty, Your Honor, I haven't researched that issue and I haven't been in that position. They're not your clients and that's not before us. Yes, Your Honor. But getting back to, I want to just address for a moment, for example, this hand card, because it appears through their brief, and they seem to argue that this hand card is some indication that the manufacturer knew how the device would work. What they ignore is that Dr. Dornfeld, in his own testimony on that hand card at page A13909, made it clear that the directions were sort of ambiguous. The ABA directions were not the Dornfeld method. He indicated, well, in reading it, yes, maybe you could push the lock in a sense, or maybe you could do his thing. It's not clear. It's sort of not inconsistent with what he's saying, but it doesn't teach what he's saying. You wanted to save three minutes. Yes, Your Honor. I'm sorry. It's up to you. No, I won't. Thank you. Mr. Stanley. The central questions that are raised in this appeal, direct infringement, inducement, damages, wilfulness, are all pure questions of factor due to substantial evidence. And the arguments that are being made to this court are the same arguments that were made during cross-examination to the jury that were made at the district court and are being re-argued here. And we've had essentially two trials on this issue. Mr. Stanley, I've got a bit of a problem with the direct infringement issue. I mean, Dynacor, other cases. I mean, Dynacor says you either – well, tell me if I'm wrong. I read it the same. You either need actual instances of direct infringement, which you don't have here, or the fact that the accused configuration necessarily infringed the patent, which I don't think you have here either. So what am I missing? Well, in this case, on the direct infringement point, the parties essentially agree that there's two modes of operating the device, one of which infringes, one of which doesn't. So it doesn't necessarily infringe because there's a non-infringing way to use the product. Right, but the jury was told that. The jury was given the lock, was shown how it would work, and the jury was able to – they made the determination that anybody who used this lock would use the infringing mode at least some of the time because they're – You correctly pointed out that the test of the jury is substantial evidence, but that means there must be some evidence. Was there any evidence of direct infringement? Yeah. Essentially, it was a battle of experts. Dr. Dornfeld said, here's how you can operate it in an infringing manner. Was he the direct infringer? Well, according to their damages theory, he was, because their damages theory was that there was one instance of direct infringement shown, and therefore we should recover from one active infringement. But what he was, he was explaining how it worked, and this is the kind of device – you don't have to know how a computer works or even how the interior of a lock works in order to see that you either push this thing forward or when you run into the resistance of the canning action, it's easier to turn it to the side before you push it in. But that's testimony about capability, not actuality. Well, what it is is it's a determination of – as Shaw mentioned, whether or not we needed survey evidence or whether Dr. Dornfeld had to go out and interview 20 people or whether Kensington had to do 5, 10, 15, 20 people to try and say this is how I use it. And I don't think there's any requirement that you have that kind of evidence. I think in this case the jury was able to listen to the expert to explain how one way worked, how the other way worked, and make a determination of how people would use the lock. And their determination, as reflected in their damages verdict, was that every single lock sold by Belkin was an infringement and was subject to damages. Yeah, but what is that? I mean the question, the concern we're having is what is the predicate for that? I mean Dr. Dornfeld was the witness, right? And when he was asked, as I recall, about what – whether he knew of anyone using this, his answer was, no, I'm not personally aware of anybody else doing it the way I did it. In other words, the way he did it before the jury. So how – I mean why is there a sufficient basis for the – on what could the jury rely that everybody was doing this? Because this is – I mean this was one where, as you mentioned, the lock was given to the jury, they used it, and this is something that's within the province of a lay jury. This is mass marketed to lay people to lock their computers down. And so they were able to see, if I push it forward, I run into a lot of resistance. Now we've heard a debate, it's sometimes easier, it's sometimes harder. The point is the jury's fact findings, implicit fact findings, are they agreed with our testimony that people would naturally figure out that it's easier to turn this thing to the side before you push it. Well, just going back to Dynacorp, Dynacorp says you have to show either actual instances of direct infringement, not inferences or whatever. I mean, am I misreading Dynacorp? Well, Dynacorp, I mean, has been cited for the intent problem, the inducement side, but from a standpoint of having to show direct infringement, the question is what kind of proof is needed. Now if you needed to come in with a survey or put people on the stand, if I put, or I didn't do it at the trial, but if we put three witnesses on a stand in a limited time trial and said this is how I use it, and they put on three witnesses and said this is the way I use it, the jury would have had to make the same determination. The question is do I need 20 people? Do I need 25? Do I have to get all 73,000 people? They did need at least one. Well, we had Dr. Dornfeld come in and explain this is how it worked and the jury was able to make the determination that this makes sense to me, this is how somebody, a layperson like me, would use it. But Mr. Stanley, the problem is that Dr. Dornfeld was an expert witness. He was not a fact witness in the sense of someone who had actually used this, and the jurors were not witnesses, they were just what they are, they're jurors, they weren't people who were direct infringers. The problem is, I agree, you say do we have to bring in all 73,000 purchasers, obviously not, but there was nothing here. All you have is an expert picking up and saying this is how I would do it. Our cases make clear, Judge Prost mentioned one, and there are others like DSU and Cross Medical, both recent cases, and make it clear there has to be evidence of direct infringement, and while it can be circumstantial, no question, there has to be something, there's just nothing here. Well, Dr. Dornfeld then would be the one person that said this is how I did it, and that shows a direct act of infringement. Yeah, but he's, no, but he's... Even as, I mean, even though he's an expert... Are you saying a courtroom demonstration constitutes an act of infringement? If it completed the system, I mean, it would be an act of infringement, in fact, there are damages there... But you can't get damages... There are damages... Wait a second, you're not saying you would claim damages for what the expert did in the courtroom?  No, but don't you agree that no one in a patent infringement suit can obtain damages for a courtroom demonstration by an expert? I'm not going to say that I would claim damages, but if I can say their damages theory during the damages phase of the trial was the only person who was an infringer was Dr. Dornfeld, and they said you get 80 cent royalty for one act of infringement. So they agreed that he showed that there could be an act of infringement. Oh yeah, but they were obviously just saying that because they're trying to make the point almost facetiously that this is the only person who did it. I mean, we know that. But that's for the jury to determine because this is not complex technology, it doesn't require specialized knowledge, it's like I said, it's something marketed to people like the jury. But don't you have to show someone did it and nobody did it here, leaving aside Mr. Dornfeld. One might say that's the key to the case. I understand. Finding a direct infringer. But I mean, if I can look at the, I mean, this really is a standard of review case in terms of the jury determined this was enough evidence for them to make that finding as to all blocks sold by Belkin. If it had come out the other way, if the jury had said no, I would have a very difficult time standing up here saying that that was reversible error. No, but the thing is, it's a question, it's not a question of assessing the evidence, it's a question of as a matter of law, is the evidence in front of the jury enough? It's not whether the jury believed Dr. Dornfeld. I'm sure they did. The question is, okay, accepting everything he says is true as a matter of law under the jurisprudence, can that establish direct infringement? I think that's the problem. Well, I'm saying this case, let's say, I would submit as yes, because if I brought in one, or I would say he collected additional claim, if I brought in one person that said this is how I used the law, the same cross-examination of Dr. Dornfeld would have done in that person. It's like, you know, do you use it, did you ask anybody else, did anybody else use it? And then I'd end up with him making the same argument that you had one act of infringement. If I brought in three, they would have done the same thing. But at least then you would have proved some direct infringement. Here you didn't prove it. Well, I mean, from a standpoint, I think this is something within the province of a jury to be able to determine that by the prominence of the evidence, this is how people would use this law. And when they made the determination in the damages trial, the damages question actually asked the second jury how many of their friends… But there was no evidence of that. They played the same testimony of Dornfeld's testimony and cross-examination. The same arguments were made in the damages trial. So in a sense, we had two damages come back with an inducement verdict there. Mr. Stanley, if we accept your position, where's the evidence to justify finding of willfulness? Of willfulness? Willfulness. Willfulness is a totality of circumstances and the jury was told, was shown evidence that Belkin… Obviously, this is a close question on inducement for lack of direct infringement. But you're saying if we find your way, willfulness, whatever willfulness means these days, that there was enough beyond the fact of inducement to find that it was willful. Where's the evidence of that? Well, willfulness, I wasn't able to attend yesterday, so I don't know what happened yesterday. That's all right. It hasn't been decided yet. That's fine. But from the standpoint of willfulness being a question of fact, once again, there was disputed evidence of whether or not the evidence… Our evidence showed that Belkin, once they got an indemnity agreement from ABA, said we don't have to dig any further. We can go ahead and sell this. And I think the jury was entitled to make the determination based on the totality of circumstances that they did not do a good faith investigation into the… Once they were not liable or they didn't have exposure for damages, they could get indemnity. Now, indemnity allows them to go after ABA, but that doesn't change the fact that they're willful. And the jury was also shown that nobody relied on the opinion that they allegedly got from ABA. So the jury was able to make a factual determination that they got an opinion. If they saw an opinion, they didn't rely on it. And that, to me, was completely disputed evidence, and the jury came back with a finding of willfulness, and that is substantial evidence to support willfulness. And that is separate from above and beyond the inducing. So I think from a standpoint of, like I said at the beginning, from a substantial evidence standpoint, I think there is evidence on which this jury could make a determination that people who use this lock, when they pick it up and they find friction and they hurt their thumb and they bend their fingernail pushing it in a straight and they realize that it makes more sense to turn it sideways, which just happens to be the admitted infringing way of using it, the jury made the determination that every lock sold by them was subject to damages. Now, they didn't give us the entire royalty we asked for. And I think inherent in the royalty number is the fact that the jury recognized sometimes people may use it in the infringing way, sometimes they won't. But all the devices are going to be used in an infringing way at least some of the time. Where's the evidence of active inducement? If we accept that there was direct infringement, then we get to inducement. There needs to be something beyond mere putting something in the marketplace capable of being infringed. Where's the instructions said to use it in a non-infringing manner, right? The instructions that felt it were not. But where's the evidence of active inducement? I can go back to this in a backward sense. The instructions, just because there's instructions that say use it in this manner, I think the jury is entitled to disregard that as a true reflection of the intent. And that somebody looking at this product would see, I mean, like I said, it's not a complex product, would see that there is an infringing way. As they said, they bought an existing lock that was on the market from ABA. You mean active inducement can be shown by evidence that says don't infringe. Use it in a non-infringing manner. That's sufficient evidence from which the jury could find inducement to use it in an infringing manner? No, I mean, that would be sufficient evidence they could find no inducement, but they didn't find that. So then we have to look to the other evidence. Substantial evidence standards, you look at the evidence that favors our position. If they had convinced the jury that that was enough, then once again I'd be on the opposite side of the table, and I'd be arguing a tough opinion. But I asked you for evidence of active inducement, and you said they looked at the instructions that said don't infringe. No, I didn't rely on the instructions. I said the jury looked at the product, and even in the DSU case, the DSU case said you knew or should have known. I mean if you look at this and should have known in a product where all you're doing is pushing it in or pushing it in sideways and then pushing it, they should have known. They can't be encouraged or allowed to ignore how the product works before they do it because if you take your analogy to willfulness, in that case if you were ever – they had knowledge of this patent. They knew about the patent. They knew about the infringement controversy in advance. And if I was shown a patent where the only way I could infringe it would be on inducement, I would throw it in the trash can under that analysis because that would mean as long as I never formed an intent about the infringement and I didn't know anything about the controversy, I would never be liable for inducement. I'd be liable for the worst kind of willfulness, but there wouldn't be liability in the first place, and that can't be the law. That's why the knew or should have known standard is in DSU. And even if you look at DSU, the recent case on inducement, DSU was a finding where they found no liability, and it was affirmed on the basis of the fact that the only thing that was before this court was whether or not it was abuse of discretion not to grant a new trial. And they said no, but I think it once again boils down to the standard of review. In this case, the jury came back having weighed all the evidence, looked at all the testimony, and found as a matter of fact that there was direct infringement by the users, by all the users, at least some of the time. They found enough to find inducement, and they found willfulness, and then the judge exercised his discretion to enhance damages in a level. And I think on this case that's been tried twice that there's substantial evidence to support each one of those fact findings, and this one should be just affirmed across the board. Thank you very much. Thank you, Mr. Stanley. Mr. Carland has a little time. It's just a couple of brief comments, Your Honor. First of all, Belkin did not have the requisite scienter, if you want to call it that. There were many reasons. The directions that it was just proof of that. Belkin was – Belkin said in the testimony that it bought this lock because it had this innovative feature, what we're calling the push-to-lock non-infringement design. It appeared in all of Belkin's advertising and promotion material. It wasn't just directions. It was testimony that the directions came about because Belkin did some in-house testing and saw how people at Belkin would use this. And it was the feature that caused Belkin to buy this lock from ABA versus somebody else's lock, the push-to-lock. And if you look at the advertising material that's in the record, that has emphasized that feature. There's no sham here. This is not a case of one set of directions versus another set of directions. Yeah, but that's not really the issue that we have to decide. We just have to decide if there's enough evidence to support the findings. So there might be a whole lot of evidence that you put forward, but that's not really the answer. No, there was no evidence. Your Honor, it's not just substantial. There was no evidence put forth by the other side as to what Belkin knew or should have known. The only quote-unquote evidence they rely upon is the fact that Dr. Dornfeld said, I used it this way the one time that I tried it. And that is a huge leap of faith. That is not substantial evidence. That's not minimal evidence. That's no evidence at all. And as I pointed out before, they could have asked Dr. Dornfeld a simple question. How would anybody else use it? Do you have an opinion on that? He had no opinion. And for the jury to infer that because Dr. Dornfeld said, I use this in this way, and sometimes it's easy to use it the other way, for the jury to infer that Belkin had in its mind that this is how its customers would use it, there was no support at all for that trial. Zero. Not some, just zero support. Thank you. Thank you, Mr. Kurlan. The case will be taken under advisement. Thank you.